**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JOSEPH S. ADDISON,

     Petitioner,       Case No. 1:21-cv-553

v.
                Dlott, J.
                Bowman, M.J.

WARDEN, CHILLICOTHE     **REPORT AND**
CORRECTIONAL INSTITUTION,  **RECOMMENDATION**

     Respondent.


   Petitioner, a state prisoner proceeding *pro se*, has filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court to

consider the Petition (Doc. 1), the Return of Writ (Doc. 7), Petitioner's Reply (Doc. 9),

and the state court record.  (Doc. 6.)

   For the reasons stated below, the Petitioner should be **DENIED**.

### I.  FACTUAL BACKGROUND

   Following accusations of sexual abuse by three of Petitioner's minor children, the

State of Ohio, Clermont County, brought charges against Petitioner under two case

numbers that were ultimately joined for trial.  The Ohio Court of Appeals for the Twelfth

Appellate District set forth the facts of this case on direct appeal:

  Testimony Regarding K.K.

  {¶ 6} The state first presented testimony and evidence focused on K.K.'s
  allegations. Toni Marshall, whose relationship with K.K. began when K.K.
  was 13 months old, testified that she considered herself K.K.'s "mom."
  According to Marshall, K.K. lived off-and-on with her biological father,
  Addison, until 2014. At that point, K.K. began spending more time with

Marshall and her family. In 2016, Addison granted temporary guardianship and legal custody of K.K. and M.A. to Marshall and her mother, Audrey Caldwell. When K.K. was in fourth grade, she moved in with Marshall and Caldwell and would occasionally visit with Addison on the weekends. Marshall indicated they would allow Addison to visit with K.K. on the weekends to appease Addison, as he would threaten to take K.K. and M.A. from them "all the time."

{¶ 7} K.K. testified that when she was around six years old Addison began touching her inappropriately. She indicated Addison put his fingers inside her vagina more than 50 times and would touch her breasts. K.K. further indicated that Addison would make her "jerk him off" sometimes, which she described as grabbing Addison's penis and "go up and down." When K.K. would "go up and down" the "wet, silky-ish, white stuff" would come out. K.K. indicated she touched Addison's penis on approximately 15 occasions. K.K. also testified that before she lived with Caldwell, Addison inserted his penis into her vagina, into her mouth, and onto her leg. K.K. estimated Addison inserted his penis in her vagina approximately five times. K.K. also recalled Addison attempting to put his penis into her "back part" twice.

{¶ 8} According to K.K., the abuse occurred every weekend she visited with Addison. The abuse began when K.K. was in second grade and occurred every year until she was 11 years old. K.K. further testified that most of the abuse occurred in Addison's bed, as she slept in his bed when she visited, but indicated it also occurred on the couch and in her bedroom. K.K. indicated she was afraid to tell anyone because Addison threatened that she would not see Marshall or Caldwell if she told.

{¶ 9} Marshall also testified regarding M.A.'s similar disclosure in November 2016 and explained why she and Caldwell continued to take K.K. to Addison's after hearing M.A.'s claims. According to Marshall, at the time M.A. made her disclosure, Addison had recently taken away her phone, and Marshall viewed her claims "more as, like, she was upset trying to get [Addison] in trouble." In light of Marshall and Caldwell's reaction to M.A.'s disclosure, K.K. was "more afraid to tell," and was afraid no one would believe her.

{¶ 10} In November 2017, when K.K. was 11 years old, K.K. disclosed the abuse to Caldwell and Marshall. According to K.K., she elected to tell someone at that point because Addison indicated he was going to "put his penis in [her]" the next time she came over, which scared her. Marshall testified that during the disclosure, K.K. indicated that inappropriate "things" had been happening for "a long time," including that Addison would make K.K. do "things" until "white stuff" came out; Addison attempted to "stick his thing" in the different "holes" she had; and that Addison would stick his

fingers inside of her and touch her inappropriately. K.K. indicated the most recent incident had occurred a few days prior.

{¶ 11} After K.K.'s disclosure, Caldwell called the police and took K.K. to Children's Hospital. When K.K. arrived at Children's Hospital, she was interviewed by a social worker. At trial, the social worker testified that the purpose of the interview was to determine whether the last instance of sexual assault occurred recent enough to require more than a basic medical exam. During the interview, K.K. stated that her dad had been touching her for the past six years. Specifically, K.K. indicated Addison had "fingered her," licked her "woo-ha," and made her "rub his 'thing,' until 'white stuff' " came out. K.K. clarified in the interview that her "woo-ha" was her vagina and that Addison's "thing" was his penis. K.K. further stated there were times where Addison attempted to insert his penis in her "butt" and vagina, but it did not go in because it "hurt too bad." K.K. also described Addison making her "finger herself." According to K.K., the last instance of sexual assault occurred on November 11, 2017. As a result of the interview, the social worker referred K.K. to the Mayerson Center.

{¶ 12} Due to the timing of the last instance of sexual assault, a doctor with Children's Hospital conducted a genital examination of K.K. At the same time, a SANE nurse completed a sexual assault kit on K.K. The doctor testified that the results of K.K.'s examination were neither normal nor abnormal. According to the doctor, K.K. did not exhibit any signs of physical injury, such as bruising, however, the doctor indicated normal findings could also be suggestive of sexual assault. Specifically, in the majority of children's sexual abuse cases there are no findings of injury. The doctor also explained that although K.K. exhibited skin tags in her perianal area, which could be a result of abuse, such a fact did not necessarily mean that abuse occurred. With regard to the genital examination, the doctor testified K.K. had a hymenal notch with a slight bit of discoloration. The doctor concluded this also was not a definitive finding of sexual assault, however, sexual assault could not be precluded either.

{¶ 13} On November 16, 2017, K.K. met with Cecilia Freihofer, a social worker at the Mayerson Center. That day, Freihofer conducted a forensic interview of K.K. Freihofer testified at trial that K.K. indicated multiple incidents of inappropriate contact during the interview, including incidents like:

> [F]ondling of the vagina with the hand by her father; digital vaginal penetration by her father; being forced to in -- for a lack of better word, masturbate her father's penis until ejaculation. There were incidents of oral/vaginal contact where he would lick her vagina. She had to lick his penis. He put his penis in her vagina, although he also -- it was -- she

was not -- in her words, like, he told her that she had to get it bigger or get it stretched out because it wouldn't go all the way in.

Penile/anal contact; penile/anal penetration; oral/penile penetration where she had to lick his penis and that she had to play with his nuts, as she called them. She had to masturbate herself in front of him and that he used a tampon on her -- in her vagina one time.

K.K. then told Freihofer one or multiple of the above acts occurred every time she visited Addison. Freihofer testified that although K.K. indicated the abuse began when she was six years old, and continued for six years, it was consistent in her experience that dates and times are unknown to children.

{¶ 14} As a result of the interview, the Mayerson Center referred K.K. to seek additional therapy or treatment. After her interview, K.K. engaged in trauma-based counseling with the Mayerson Center for six or eight weeks, and remained in outside counseling at the time of trial.

{¶ 15} The state also presented testimony from Detective Erin Williams with the Union Township Police Department. The detective testified that after she was assigned the case, she reviewed the reports from the Mayerson Center and Children's Hospital regarding the allegations. As a part of the investigation, the detective facilitated a controlled call between K.K. and Addison. A recording of the call was played for the jury and admitted into evidence. During the call, K.K. said that she has been sick lately because she had been having a hard time dealing with their "little secret" and that she wanted to talk "serious" about their secret. Addison responded that she did not have to come over to the house anymore. Addison further indicated that their secret was "done" and that K.K. "didn't have to worry about it anymore." K.K. stated she needed him to promise that he would not touch her "who-ha" anymore, to which Addison responded "okay." Addison then began discussing Christmas, and asked if K.K. wanted any "big ticket items." K.K. told him he could not buy her off, and that she wanted him to promise her "this stuff." Addison responded, "okay, it's done and over with" and "I already said fine."

{¶ 16} After the controlled call, the detective contacted the prosecutor's office and a search warrant was executed on Addison's apartment in Clermont County on November 27, 2017. While executing the search warrant, several items were collected from Addison's apartment and submitted for DNA testing including fingernail clippings, a mattress cover, a fitted sheet, a flat sheet, a section of fabric from the couch, and a DNA

comparison for Addison. Those items were submitted to the Bureau of Criminal Investigations ("BCI") for DNA testing on April 27, 2018.

{¶ 17} The BCI forensic scientist who examined the items submitted by Detective Williams also testified at trial. During his testimony, the forensic scientist indicated he tested the fitted bedsheet for semen, and that the results were positive. At that point, the fitted bedsheet was stored for subsequent DNA testing and the remaining items were not tested. Thereafter, a DNA analyst with BCI testified regarding the DNA results from K.K.'s rape kit and the bedsheet. With regard to K.K.'s rape kit, the analyst testified no semen or DNA foreign to K.K. was discovered in any of the samples included in the kit. However, the bedsheet contained two stains, each determined to contain semen. When testing the first stain, the analyst concluded that the stain contained a mixture of DNA which included the DNA of Addison, K.K., and an unknown female. K.K. was included in the mixture as one in one hundred thousand non-sperm fraction. The analyst testified his findings were consistent with K.K.'s allegation that she was forced to masturbate Addison until completion on that sheet, however, he further testified there were "numerous ways" that could explain K.K.'s DNA presence in the mixture. With regard to the second stain, the analyst concluded that while Addison's DNA and an unknown female DNA were present in the mixture, K.K. was excluded from the comparisons the analyst could make.

Testimony Regarding M.A.

{¶ 18} At trial, M.A. testified that when she was young, her father, Addison, touched her inappropriately. M.A. specified that in 2007 Addison touched the outside of her vagina area with his hands. M.A. also described a time when she and Addison were sleeping on the floor at Addison's residence. While M.A. was sleeping, she awoke to find Addison touching her leg and "trying to go * * * between [her] legs and up [her] thighs." M.A. got up and told Addison not to touch her again.

{¶ 19} At trial, M.A. also stated that Addison asked her to "sit on [his] face" through a Facebook message, and consistently made comments about her body, including that she had "nice thighs" and a "nice butt." According to M.A., she did not tell anyone about the incidents because she did not want to be separated from K.K. Ultimately, M.A. disclosed the abuse to her friend and sister in November 2016.

{¶ 20} The state also presented testimony from Sergeant Bernard Boerger with the Clermont County Sheriff's Office. The sergeant testified that he was the road sergeant who responded to M.A.'s allegations. The sergeant spoke with M.A.'s sister, A.A., and ultimately made contact with M.A. at Addison's residence. Due to the allegations, the sergeant removed M.A. from the

residence, took her to her grandmother's home, and contacted children's protective services regarding the situation. Thereafter, the sergeant was not involved in any additional investigation into M.A.'s allegations, however, he confirmed it was not unusual for a case to remain open while additional evidence was collected. After the sergeant's initial investigation into the allegations, the case was assigned to Investigator Lori Saylor with the Clermont County Sheriff's Office. The investigator testified at trial, and stated that because Addison was aware of the allegations, the investigation was limited. According to the investigator, she advised M.A. to go to the Mayerson Center.

{¶ 21} On November 23, 2016, approximately one year prior to interviewing K.K., Cecilia Freihofer, the social worker with the Mayerson Center, interviewed M.A. regarding her allegations. At trial, Freihofer testified that at the time of the interview, M.A. was 14 years old. M.A. described the first instance of sexual assault, which occurred when she was around six years old, but she could not recall specifically what had happened. M.A. knew Addison had touched her vagina and that she did not have clothes on. M.A. recalled a second incident where Addison began rubbing her stomach on top of her clothing and attempted to put his hands down her pants. At that point, M.A. left the room.

{¶ 22} Freihofer indicated that M.A. was afraid to disclose the abuse sooner, as Addison had threatened to move her away from her family, siblings, and friends if she told. M.A. also disclosed to Freihofer that she had developed suicidal thoughts in the last week. As a result of the interview, Freihofer recommended a physical exam be completed, however, M.A. declined. Freihofer further recommended that M.A. engage in consistent ongoing therapy.

*State v. Addison*, Nos. CA2019-07-058, CA2019-07-059, 2020-Ohio-3500, 2020 WL 3494430, *1-4 (Oh App. 12th Dist. June 29, 2020).

Following a six-day jury trial, Petitioner was convicted of four counts of rape and three counts of gross sexual imposition.  The trial court sentenced Petitioner to two consecutive and mandatory terms of ten years to life in prison for the rape charges in counts one and three, five concurrent years in prison for gross sexual imposition, and two consecutive life without parole sentences for the rapes charged in counts four and

five.  The aggregate term was life in prison without parole, plus 20 years.  (Doc. 6, PAGEID # 192.)

## II.    PROCEDURAL HISTORY

### A.    Direct Appeal

Petitioner, represented by counsel, filed a timely notice of appeal to the Twelfth District Court of Appeals, raising five assignments of error:

> First Assignment of Error:  The trial court erred by refusing to consider appellant's request to represent himself in the proceedings.

> Second Assignment of Error:  The trial court erred as a matter of law not giving a jury unanimity instruction when requested by counsel and when the victim was thirteen years old while testifying.

> Third Assignment of Error:  The court erred by consolidating cases 2017 CR 00823 and 2018 CR 00721.

> Fourth Assignment of Error:  The evidence was insufficient for a finding of guilty.

> Fifth Assignment of Error:  The verdict was against the weight of the evidence.

(Doc. 6, PAGEID # 227.)  On June 29, 2020, the Court of Appeals affirmed the judgment of the trial court.  (*Id*. at PAGEID # 346); *Addison*, 2020 WL 3494430.

On August 3, 2020, Petitioner appealed, *pro se*, to the Ohio Supreme Court raising the same claims he presented to the Twelfth District Court of Appeals.  (Doc. 6, PAGEID # 374.)  On October 13, 2020, the Ohio Supreme Court declined to exercise jurisdiction.  (*Id*. at PAGEID # 478); *State v. Addison*, 160 Ohio St. 3d 1420 (2020).

### B.    Post-Conviction

Petitioner did not pursue post-conviction relief.

### C.    Rule 26(B) Application to Reopen Appeal

On August 17, 2020, Petitioner moved for an extension of time to file an application to reopen his direct appeal.  (Doc. 6, PAGEID # 479.)  The court of appeals denied the motion, directing Petitioner to explain any late filing in his Rule 26(B) application.  (*Id*. at PAGEID # 495.)  On August 31, 2020, Petitioner filed a Rule 26(b) application setting forth eight assignments of error.  (*Id*. at PAGEID # 485-93.)  The court of appeals denied the application, finding Petitioner failed to raise a genuine issue as to whether he was denied the effective assistance of counsel on appeal.  (*Id*. at PAGEID # 513-16.)  Specifically, the court of appeals determined Petitioner "failed to present any specific factual or legal arguments to support the broad contentions in . . . his proposed assignments of error."  (*Id*. at PAGEID # 515.)  Petitioner's attempt to file a delayed appeal to the Ohio Supreme Court was denied.  (*Id*. at PAGEID # 530.)

### III.  HABEAS PROCEEDINGS

On August 20, 2021, Petitioner, proceeding *pro se*, filed a petition for a writ of habeas corpus, setting forth twelve grounds for relief.  (Doc. 1.)  Specifically, Petitioner asserts:

> First ground for relief:  The trial court erred by refusing to consider appellant's request to represent himself in the proceedings.  According to the Sixth Amendment and Article 1 Section 10 of the Ohio Constitution, a criminal has a right of self-representation and may defend himself or herself without counsel when he or she voluntarily, knowingly, and intelligently elects to do so.

> Second ground for relief:  The trial court erred as a matter of law not giving a jury unanimity instruction, as required by U.S. Const. amend. VI, when requested by counsel and when the victim was thirteen years old while testifying.

> Third ground for relief:  The trial court erred by consolidating case number 2017-CR-00823 with case number 2018-CR-00721, violating petitioner's rights under United States Const. Am. 5, 6, and 14.

Fourth ground for relief: The jury erred by finding Petitioner guilty when the evidence was insufficient to support a conviction, violating petitioner's rights under United States Const. Am. 5, 6, and 14.

Fifth ground for relief: Petitioner's convictions are against the manifest weight of the evidence possession in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and Article 1, Section 1, 10 & 16 of the Ohio Constitution.

Sixth ground for relief: Petitioner was prejudicially deprived of his right to effective assistance of appellate counsel on direct appeal as secured by the Sixth Amendment to the United States Constitution and Article 1, Section 1, 10 & 16 of the Ohio Constitution.

Seventh ground for relief: The trial court failed to instruct the jury on a lesser included offense in violation of the 5th & 14th Amendments.

Eighth ground for relief: The trial court erred in admitting irrelevant prejudicial evidence, violating petitioner's Due Process rights of the 14th Amendment.

Ninth ground for relief: The State Prosecutor deliberately interjected irrelevant and prejudicial evidence throughout the entire trial, violating petitioner's Due Process rights of the 14th Amendment as well as the Sixth and the Eighth Amendments to the U.S. Constitution.

Tenth ground for relief: Petitioner was denied his right to a fair trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution because the trial court failed to excuse for cause several biased jurors.

Eleventh ground for relief: The trial court failed to take necessary steps to ensure that the jury was impartial, in violation of petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights to the United States Constitution.

Twelfth ground for relief: Petitioner's due process rights under the 5th, 6th, 8th and 14th amendments of the Constitution were violated by the trial court's denial of experts to assist his trial counsel in preparing for trial.

(Doc. 1.) On December 16, 2021, Respondent filed a Return of Writ, arguing that

all of Petitioner's claims are either procedurally defaulted or without merit. (Doc.

7.) On March 24, 2022, Petitioner filed his Reply. (Doc. 9.)

## IV.  STANDARDS OF REVIEW

### A.  AEDPA

Because this is a habeas corpus case, provisions of the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104-132, 110 Stat. 1214, apply

to this case.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA limits the

circumstances under which a federal court may grant a writ of habeas corpus with

respect to any claim that was adjudicated on the merits in a state court proceeding.

Specifically, under AEDPA, a federal court shall not grant a writ unless the state court

adjudication "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of

the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding," 28 U.S.C. § 2254(d)(2).  Section 2254(d)(1) circumscribes a federal court's

review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's

review of claimed factual errors.  This standard is "intentionally difficult to meet." *Woods*

*v. Donald*, 575 U.S. 312, 316 (2015).  Additionally, this Court's habeas review is limited

to the record that was before the state court that adjudicated the claim on the merits.

*Cullen v. Pinholster*, 563 U.S. 170 (2011).

### B.  Procedural Default

In recognition of the equal obligation of the state courts to protect the

constitutional rights of criminal defendants, and in order to prevent needless friction

between the state and federal courts, a state criminal defendant with federal

constitutional claims is required to first present those claims to the state courts for

consideration.  28 U.S.C. § 2254(b), (c).  If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275-78 (1971)).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas."  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Over time, the term "procedural default" has come to describe a situation where a person convicted of a crime in a state court fails (for whatever reason) to properly present a particular claim to the highest court of the state so that the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process.  This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review."  *Hicks v. Straub*, 377 F.3d 538, 552-53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted.  That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court.  As the Supreme Court found in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to [the] failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case – that

is, they are "procedurally defaulted."  It is well settled that "[a] common example of a procedural default is a failure to raise a claim in state court in a timely manner."  *Gibbs v. Huss*, 12 F.4th 544, 550 (6th Cir. 2021).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test.  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also McNeill v. Bagley*, 10 F.4th 588, 595 (6th Cir. 2021) (citing the four-part *Maupin* standard).  First, the court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction.  Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. Finally, if the court determines that a state procedural rule was not complied with and the rule has an adequate and independent state ground, then the petitioner may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error.  *Maupin*, 785 F.2d at 138.  In order to establish cause, a petitioner must show that "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The petitioner bears the burden of showing cause and prejudice.  *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999)).

## V.  DISCUSSION

In his habeas petition, Petitioner sets forth twelve grounds for relief.  The Court will first address the issue of procedural default and then will address the merits of Petitioner's remaining claims.

### A.  Procedural Default

In claims seven through twelve, Petitioner sets forth several claims of trial court error.  Specifically, Petitioner argues the trial court failed to instruct the jury on a lesser included offense (claim seven), erroneously admitted prejudicial evidence from his home (claim eight), allowed perjured testimony from the minor victims (claim nine), failed to excuse biased jurors (claim 10), failed to instruct the jury on the multiple step criminal justice process (claim eleven), and refused to permit Defendant to call a defense investigator and CPS investigator to testify at trial (claim twelve).  (Doc. 1.)

Respondent contends that claims seven through twelve are procedurally defaulted, because Petitioner did not raise those claims on direct appeal.  (Doc. 7, at PAGEID # 2439.) Respondent notes that the claims of trial court error set forth in claims seven through ten and claim twelve all relate to the claims of appellate counsel ineffectiveness that Petitioner attempted to raise in his unsuccessful application to reopen his direct appeal.  Respondent argues, however, that those allegations of ineffective assistance of appellate counsel cannot serve as cause and prejudice to excuse Petitioner's default of the underlying claims of trial court error, because the state appellate court determined those allegations did not raise genuine issues of appellate counsel ineffectiveness sufficient to reopen Petitioner's direct appeal.  (*Id*. at 2440.) With respect to claim eleven, Respondent asserts that Petitioner has never attempted to

raise this claim regarding the trial court's failure to instruct on the criminal justice

process before the state courts, and also failed to assert a corresponding claim of

appellate counsel ineffectiveness in his Rule 26(B) application.  (*Id.*)  For the reasons

that follow, the Undersigned agrees with Respondent and therefore recommends that

claims seven through twelve be dismissed as procedurally defaulted.

As set forth above, Petitioner, represented by counsel, filed a timely notice of

appeal to the Twelfth District Court of Appeals, raising five assignments of error:

> First Assignment of Error:  The trial court erred by refusing to consider appellant's request to represent himself in the proceedings.
>
> Second Assignment of Error:  The trial court erred as a matter of law not giving a jury unanimity instruction when requested by counsel and when the victim was thirteen years old while testifying.
>
> Third Assignment of Error:  The court erred by consolidating cases 2017 CR 00823 and 2018 CR 00721.
>
> Fourth Assignment of Error:  The evidence was insufficient for a finding of guilty.
>
> Fifth Assignment of Error:  The verdict was against the weight of the evidence.

(Doc. 6, PAGEID # 227.)  The Court of Appeals affirmed the judgment of the trial court,

*Addison*, 2020 WL 3494430, and the Ohio Supreme Court declined to exercise

jurisdiction over any further appeal.

It is apparent from Petitioner's assignments of error that he did not raise on direct

appeal any of the claims of trial court error that he now attempts to set forth as claims

seven through twelve before this Court.  Habeas claims seven through twelve are all

record-based claims that could have been raised on direct appeal, and Petitioner's

failure to do so constitutes a procedural default.  The question this Court must decide is whether cause and prejudice exists to excuse the default of these claims.

On August 31, 2020, Petitioner filed a Rule 26(b) application to reopen his direct appeal.  The application set forth eight assignments of error that Petitioner argued appellate counsel should have raised on direct appeal.  The first assignment of error merely summarized assignments two through eight:

> Second assignment of Error:  The trial court erred by denying appellant's request to include a lesser included offense in the instructions to the jury, violating appellant's Sixth, Eighth, and Fourteenth [Amendment] Rights.

> Third Assignment of Error:  Appellant's rights to due process were violated under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution because prejudicial evidence was introduced at trial.

> Fourth Assignment of Error:  The state interjected irrelevant and prejudicial evidence about the victim into the trial phase in violation of the rules of evidence and the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

> Fifth Assignment of Error:  Appellant was denied his right to a fair trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution because the trial court failed to excuse for cause several biased jurors.

> Sixth Assignment of Error:  The procedure and instructions of the trial court during voir dire skewed this entire case in favor of guilty verdicts in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

> Seventh Assignment of Error:  Appellant was convicted and sentenced on insufficient evidence in violation of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution.

> Eighth Assignment of Error:  The trial court failed to permit the defense to call its investigator to the stand and failed to permit Kim Beverly, a CPS investigator, to the stand.  The trial court's denial of the experts denied appellant his rights to due process, equal protection, and effective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

(Doc. 6, PAGEID # 485-493.)  The court of appeals denied the application, finding Petitioner "failed to present any specific factual or legal arguments to support the broad contentions" in his proposed assignments of error, and concluding there was "no genuine issue as to whether appellant was deprived of the effective assistance of counsel on appeal."  (*Id*. at PAGEID # 515.)  Petitioner's attempt to file a delayed appeal to the Ohio Supreme Court was denied.  (*Id*. at PAGEID # 529.)

It is well settled that the ineffective assistance of appellate counsel can serve as cause and prejudice to excuse the procedural default of an underlying substantive claim.  *Chase v. MaCauley*, 971 F.3d 581, 592 (6th Cir. 2020) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).  *Edwards v. Carpenter* requires the Petitioner to have presented a corresponding ineffective assistance of counsel claim to the state courts in order to assert it as cause, and in this case, Petitioner did so, at least with respect to claims seven through ten and claim twelve.  Petitioner cannot assert the ineffective assistance of appellate counsel to excuse claim eleven, because he did not attempt to raise a corresponding claim of ineffective assistance of appellate counsel in his application for reopening.

"'An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel.'"  *McCauley*, 971 F.3d at 592 (quoting *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009)).  Specifically, "[t]he latter must meet the higher AEDPA standard of review, while the former need not."  *Id*.  *See also Smith v. Warden*, 780 F. App'x 208, 225 (6th Cir. 2019).  As a result, this Court reviews *de novo* the question of whether the

ineffective assistance of appellate counsel excuses the procedural default of Petitioner's various claims of trial court error.  *Id*.

    In order to establish cause and prejudice, Petitioner must show that his appellate counsel's failure to raise his claims of trial court error rose to the level of a constitutional violation under *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* sets forth a two-prong test for assessing ineffective assistance of counsel claims: (1) "the defendant must show that counsel's performance was deficient," and (2) "the defendant must show that the deficient performance prejudiced the defense."  *Id*. at 687.  Counsel's failure to raise an issue on appeal amounts to ineffective assistance of counsel only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal.  *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011).  An appellate attorney need not advance every argument, regardless of merit, urged by an appellant.  *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).  Moreover, a strong presumption of effectiveness applies, and this Court must "consider a number of factors, including whether the omitted issues [were] significant and obvious and whether they were clearly stronger than those presented in the actual appeal."  *Jones v. Bell*, 801 F.3d 556, 562 (6th Cir. 2015). *See also Mapes v. Coyle*, 171 F.3d 408, 427-29 (1999) (setting forth non-exhaustive list of factors to consider).

    Here, Petitioner has made several allegations of trial court error but has failed to clearly identify the error in some instances, and has failed to show that his appellate counsel was ineffective for failing to raise the alleged error in all instances.  Petitioner's arguments are conclusory, speculative and lack evidentiary support.  For example, in his seventh ground for relief, Petitioner asserts the trial court erred by failing to instruct

the jury on a lesser included offense.  This allegation is vague, as Petitioner fails to specify the lesser included offense that should have been instructed or why an instruction on that lesser offense was required under the facts of his case.  In his eighth ground for relief, Petitioner argues the trial court admitted prejudicial evidence recovered from his home.  Specifically, Petitioner references "[e]vidence regarding dirty clothes, a blanket, a mattress cover, the top sheet, center fabric from sofa, a pair of children's socks, 10.1 Samsung tablet, a Samsung Note 8 cellphone, and one hard drive."  (Traverse, Doc. 9, at PAGEID # 2487.)  Petitioner argues only that "the bulk of the non-tested items had no evidentiary value" and displaying these items "led jurors to believe all these items collected had value."  (*Id*.)  Petitioner does not articulate with any specificity how appellate counsel's decision not to challenge these items was deficient performance or prejudiced the outcome of his trial.

The same can be said of Petitioner's argument in his ninth ground for relief that counsel was ineffective for failing to challenge on appeal the trial court's admission of perjured testimony from the minor victims.  Petitioner argues only that the State knew the victims "testified falsely at trial when they testified that Addison committed the offenses that he now stands convicted of, and the prosecutors should have known their testimony was untruthful," (*Id*. at PAGEID # 2488), but fails to offer any evidentiary support suggesting the minor victims gave false testimony.  Similarly, with respect to his juror bias claim in his tenth ground for relief, Petitioner states only that jurors Knox and Feldhaus "exhibited a predisposition to be biased towards him."  (*Id*.)  Petitioner directs the Court's attention to the transcript of voir dire wherein both jurors stated that family members had been victims of sexual assault, (Doc. 6-24, PAGEID # 1001-1005), but

18

Petitioner points to nothing in the record suggesting those jurors indicated bias or an inability to be fair and impartial.  In his twelfth ground for relief, Petitioner contends the trial court refused to allow him to call defense experts but fails to articulate how these experts would have helped his case in any meaningful way.  Petitioner's allegations are conclusory, lack evidentiary support, and are not supported by the record.

In short, Petitioner has not established that his appellate counsel performed deficiently by demonstrating that the unraised claims were more likely to be successful on appeal than the various claims raised by appellate counsel, or that any of the omitted issues were "significant and obvious."  *Mapes*, 171 F.3d at 427-28.  Nor has Petitioner demonstrated prejudice stemming from appellate counsel's failure to raise the various conclusory allegations of trial court error that he attempts to set forth in claims seven through ten and twelve.  To establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, a habeas petitioner must make more than speculative assertions. *See Workman v. Bell*, 160 F.3d 276, 287 (6th Cir. 1998) (conclusory allegations of ineffective assistance of appellate counsel do not warrant habeas relief); *Brown v. Foltz*, 763 F.2d 191, 194 (6th Cir. 1985) (denying ineffective assistance of appellate counsel claim that was "far too speculative").  As a result, Petitioner cannot establish cause and prejudice to excuse the procedural default of those claims resulting from appellate counsel's failure to raise the claims on direct appeal.  Claim eleven is procedurally defaulted because it was not raised on direct appeal, and Petitioner failed to raise a corresponding claim of appellate counsel ineffectiveness that could be considered as cause and prejudice.  Accordingly,

the Undersigned **RECOMMENDS** that claims seven through twelve be **DISMISSED** as procedurally defaulted.

### B.  Merits of Remaining Claims

#### 1.  Sixth Amendment Right to Self-Representation

In his first claim for relief, Petitioner argues the trial court erred by denying his request to represent himself at trial.  Petitioner contends he "explained to the court that his counsel was not representing him in the manner expected" and he wanted counsel removed.  (Doc. 1, PAGEID # 7.)  According to Petitioner, when he asked to represent himself, "[t]he trial court simply responded with: 'denied.'"  (*Id*.)

Petitioner raised this claim challenging the denial of his right to self-representation on direct appeal as his first proposition of law.  The Twelfth District Court of Appeals considered and rejected the claim on the merits, finding as follows:

> {¶ 28} In his first assignment of error, Addison argues the trial court improperly denied him the right to self-representation.

> {¶ 29} According to the Sixth Amendment, a criminal has a right of self-representation and may defend himself or herself without counsel when he or she voluntarily, knowingly, and intelligently elects to do so. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 71. "The assertion of the right to self-representation must be clear and unequivocal." *Id*. at ¶ 72. A request for self-representation is not unequivocal if it is a "momentary caprice or the result of thinking out loud, or the result of frustration." *Id*. at ¶ 73. Nor is a request unequivocal if it is "an emotional response." *State v. Steele*, 155 Ohio App.3d 659, 2003-Ohio-7103, ¶ 13 (1st Dist.); see also *State v. Frost*, 12th Dist. Fayette No. CA2018-11-023, 2019-Ohio-3540.

> {¶ 30} After being indicted, Addison was appointed counsel. Due to a conflict, Addison's appointed counsel withdrew from the case, and Addison was appointed new counsel, Brian Goldberg. Thereafter, Goldberg filed a motion to withdraw as counsel, as he felt the relationship had deteriorated to the point where he was unable to provide effective representation for Addison. The trial court granted Goldberg's motion, and appointed a third attorney.

{¶ 31} In September 2018, Addison's new attorney filed a motion to withdraw as counsel, wherein she indicated Addison had requested, via letter, for her to remove herself as counsel. A few days later, the trial court held a hearing regarding the matter. At the hearing, the attorney explained that Addison was dissatisfied with her representation. Addison stated he was unhappy with his attorney because he felt she was working with the prosecutor and laughed at Addison for electing to go to trial rather than accepting a plea deal. Addison also claimed his attorney would not address allegedly exonerating witnesses and would not file various motions Addison felt were necessary to his defense.

{¶ 32} Addison's mother and aunt also spoke at the hearing. Both indicated Addison's stubbornness and disabilities were difficult for an attorney to handle. However, according to Addison's aunt, Addison just wanted an attorney that would listen to him and research the case. The trial court proceeded to ask Addison whether he had a specific attorney in mind, and Addison asked to see the list of available attorneys. At that point, the following discussion ensued:

> THE COURT: [G]ive me my list.
> ADDISON: If I can only pick from the list, I'll pick from that list.
> THE COURT: Well, I'm not certain that I'm going to let you pick. I want to know if you had somebody in mind.
> ADDISON: At this point – I'd take Goldberg back.
> * * *
> ADDISON: If he'll take me back, I'll take Goldberg.

{¶ 33} The trial court then expressed its concern to Addison, and indicated, "You're articulate. You're no dummy. You speak for yourself. But there's a limit to how far you need to go to get what you want. That's all. And sometimes you don't understand your limitations. That's why you have to have a lawyer." In response, Addison indicated that "if [he] had a lawyer that came and [saw him], [he] wouldn't have to worry about it." According to Addison, he was upset that his attorneys were not handling the case the way he wanted and that "the one thing that [he's] asked for from the very beginning * * * [he] want[s] an attorney to come see [him]." The trial court then explained to Addison that "it's not for [Addison] to decide what [his attorneys] do" and that Addison did not understand his attorney's decisions.

{¶ 34} At that point, Addison requested to appoint himself as his own attorney. The trial court denied his request and the two continued to discuss which attorney to appoint. Addison then stated "I've asked him to appoint myself. You've already seen I'm competent enough to do it. You've denied me." The trial court responded, "[y]eah, he's just angry." The trial court and Addison then continued to discuss the attorneys who could handle the case,

and ultimately reached an agreement as to several attorneys, including Goldberg, whom Addison indicated he would be comfortable proceeding with. The trial court reiterated, "Okay, you're saying that on your own?" To which Addison responded, yes.

{¶ 35} After a review of the record, we find that Addison's right to self-representation was not violated because he did not unequivocally and explicitly invoke his right. Rather, a review of the entire record reveals that Addison's reference to self-representation was the result of frustration and was an emotional response to the statements made at the hearing. Addison's statement about representing himself came immediately after he expressed his frustrations with defense counsel's decisions and strategies, as well as his belief that his attorney was working in collusion with the prosecutor.

{¶ 36} Furthermore, Addison's statement regarding self-representation directly conflicted with his clear intention to obtain a new lawyer just minutes before at the same hearing. According to the record, before and after stating he wished to appoint himself as his own attorney, Addison and the trial court discussed in detail who was competent to represent Addison and what Addison expected from his new attorney. In fact, Addison had already requested the trial court to re-appoint Brian Goldberg, the attorney he previously terminated, at the point he indicated he wished to represent himself. Moreover, by the conclusion of the hearing, Addison had identified a number of attorneys he would be comfortable with handling his defense. Such facts are indicative that Addison's request was not clear and unequivocal. *Frost*, 2019-Ohio-3540, ¶ 30 (finding a request for self-representation was the product of an emotional response to the situation where the defendant acquiesced to his assigned counsel representing him at trial just ten minutes later). Rather, the record indicates Addison's statement was made out of frustration with the situation, as the trial court had just informed Addison that, although he could be involved in his defense, he could not decide what his attorneys did or how they conduct his defense.

{¶ 37} Lastly, aside from an additional comment near the end of the hearing, Addison did not renew his request at a later date. We are not saying that he has to do so, but we conclude that this fact is helpful in evaluating Addison's intended use of the request, i.e., was it a sincere desire to proceed pro se or manipulative in nature. Ultimately, we find the record supports the trial court's decision to deny Addison's request to proceed pro se. Accordingly, finding no merit to Addison's claims, his first assignment of error lacks merit and is overruled.

*Addison*, 2020 WL 3494430, at *5-7.

It is well settled that "[t]he Sixth Amendment guarantees a criminal defendant the right to counsel, as well as the corollary right to waive counsel and proceed *pro se* even when the court believes that it would not be advisable." *United States v. Powell*, 847 F.3d 760, 774 (6th Cir. 2017) (citing *Faretta v. California*, 422 U.S. 806, 807, 819-20 (1975)). Forcing a defendant to accept an appointed attorney against his will violates his "constitutional right to conduct his own defense." *Faretta*, 422 U.S. at 836. This is because "[a]n unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense." *Id*. at 821.

*Faretta v. California* is the clearly established federal law applicable to this claim. *Faretta* instructs that a "searching or formal inquiry" must follow a defendant's invocation of the right to conduct his or her own defense when that invocation is made clearly, unequivocally, and in a timely fashion. *See Cassano v. Shoop*, 1 F.4th 458, 466 (6th Cir. 2021). The inquiry allows a trial court to determine whether the defendant's waiver of counsel was made "knowingly, intelligently, and voluntarily[,]" and the trial court must warn the defendant "specifically of the dangers and disadvantages of self-representation." *Powell*, 847 F.3d at 774 (internal quotation marks and citations omitted). "This *Faretta*-compliant hearing must be held without delay." *Cassano*, 1 F.4th at 466-67.

The right to self-representation, however, "is not absolute." *Martinez v. Ct. of Appeal of Cal., Fourth App. Dist*., 528 U.S. 152, 161 (2000). A trial court may "terminate self-representation or appoint 'standby counsel' – even over the defendant's objection –

if necessary." *Id*. at 162.  Further, "standby counsel may participate in the trial proceedings, even without the express consent of the defendant, as long as that participation does not seriously undermin[e] the appearance before the jury that the defendant is representing himself." *Id*. (internal quotation marks omitted).  The *Faretta* Court itself noted "[t]he right of self-representation is not a license to abuse the dignity of the courtroom."  422 U.S. at 834 n.46.  To that end, trial courts may weigh the potential for disruption and delay against a defendant's right to self-representation, because "the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer."  *Id*.

Here, the issue before the state courts was whether Petitioner ever clearly and unequivocally invoked his constitutional right to conduct his own defense.  After carefully examining the transcript of the proceedings, the state appellate court determined Petitioner did not clearly and unequivocally invoke his right to self-representation.  Because the state appellate court adjudicated this claim on the merits, AEDPA deference is due.  That is, Petitioner must show that the state court decision was either contrary to, or involved an unreasonable application of *Faretta*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

In this case, the state court decision must be given the benefit of the doubt, because a review of the state court record more than supports the appellate court's decision that Petitioner never unequivocally invoked his right to self-representation, but instead expressed interest in doing so out of emotion and frustration with appointed counsel, as opposed to a genuine desire to represent himself.  At the time Petitioner asked to be "appointed" as his own counsel, he was represented by Attorney Gossett, his third attorney of record.  Petitioner was generally dissatisfied with Attorney Gossett and asked that she withdraw.  When the trial court held a hearing on Petitioner's complaints, (Doc. 6-15, at PAGEID # 743-97), Petitioner accused Attorney Gossett of failing to visit him in jail, failing to consult with him or his family, waiving speedy trial without his consent, and winking and colluding with the prosecutor in order to force a plea agreement.  Petitioner further complained that Attorney Gossett would not file certain motions that she deemed baseless, and generally, she would not let him call the shots in his case.  (*Id*. at PAGEID # 743-748, 752-753, 755.)  The trial court permitted Petitioner's aunt to speak during the hearing, and she detailed unsuccessful attempts to raise funds to hire retained counsel for Petitioner, including attempts to sell her home, cars and jewelry.  (*Id*. at PAGEID # 757-758.)

Although Petitioner asked the court "to appoint myself," Petitioner also inquired whether he could see the trial court's list of eligible appointed attorneys and chose replacement counsel from that list.  (*Id*. at PAGEID # 777-782.)  Twice Petitioner asked the Court to consider reappointing Attorney Goldberg, who was previously permitted to withdraw from the case due to Petitioner's complaints and dissatisfaction with his performance.  (*Id*. at 770, 783.)  Petitioner also informed the trial court that if he "had a

lawyer that came and see[sic] me, I wouldn't have to worry about it." (*Id*. at PAGEID # 773.)  Ultimately, Petitioner began to negotiate the selection of replacement counsel from the court's list.  (*Id*. at PAGEID # 69-70, 782-85.)  Once the list was narrowed down to two potential attorneys, Petitioner stated:  "If you can give me one of those two . . . I'll be happy with them."  (*Id*. at PAGEID # 784-85.)  The record reflects that what Petitioner wanted was an attorney who would do as they were told.

The state appellate court determined Petitioner's request to represent himself was an emotional response that was not clear and unequivocal.  It is apparent from the hearing transcript that Petitioner's request was made out of frustration with appointed counsel's ethical boundaries regarding the filing of frivolous motions and communication of pleas offers, as well as the frequency of counsel's jail visits.  Although Petitioner first indicated a desire to waive counsel, he ultimately changed his mind and sought to participate in the selection of replacement counsel, thereby superseding his prior request to represent himself.  Under these facts, the trial court did not err in appointing new counsel for Petitioner without holding a full *Faretta* hearing.  For these reasons, and in light of the AEDPA's highly deferential standard of review, the Court must conclude that the state court decision was not based on an unreasonable determination of the facts, nor was it contrary to clearly established federal law.  *See, e.g., Marshall v. Warden*, No. 2:11cv249, 2013 WL 228024, *3 (S.D. Ohio Jan. 22, 2013) (habeas relief denied on *Faretta* claim where request for self-representation made out of anger and frustration with court appointed counsel).

For these reasons, the Undersigned **RECOMMENDS** Petitioner's first ground for relief be **DENIED**, as Petitioner cannot establish that he is entitled to habeas relief on this claim.

### 2. Unanimity Instruction

In his second claim for relief, Petitioner asserts the trial court deprived him of his constitutional rights by failing to provide a specific unanimity instruction that would have required the jury to agree unanimously on which criminal act constituted each charge. (Doc. 1, PAGEID # 7-8.) The Twelfth District Court of Appeals determined that no such instruction was required under Ohio law, as this case involved a continuing course of criminal sexual conduct involving a young victim:

{¶ 38} Assignment of Error No. 2:

{¶ 39} THE TRIAL COURT ERRED AS A MATTER OF LAW NOT GIVING A JURY UNANIMITY INSTRUCTION WHEN REQUESTED BY COUNSEL AND WHEN THE VICTIM WAS THIRTEEN YEARS OLD WHILE TESTIFYING.

{¶ 40} In his second assignment of error, Addison argues the trial court erred in denying his request to give a specific unanimity instruction to the jury. Addison asserts that in refusing to give the instruction, it created the potential for piecemeal verdicts, which is "especially true given the fact that some guilty and some not-guilty verdicts were returned for the same charges and the same victim."

{¶ 41} Jury instructions are matters left to the sound discretion of the trial court. *State v. Warman*, 12th Dist. Butler No. CA2016-02-029, 2017-Ohio-244, ¶ 35. Therefore, this court reviews the trial court's decision refusing to provide the jury with a requested jury instruction for an abuse of discretion. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable. Id.

{¶ 42} This court has previously rejected similar arguments to those Addison raises on appeal. See *State v. Bowling*, 12th Dist. Butler No. CA2014-01-017, 2015-Ohio-360, ¶ 29-32; *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 22 (12th Dist.). In Bowling, we recognized that "a general unanimity instruction will ensure that the jury is unanimous on the

factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability." *State v. Johnson*, 46 Ohio St.3d 96, 104 (1989). "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive * * * the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *Id*. While there are exceptions to this general rule as outlined in Johnson and in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, we found in *Blankenburg* that juror unanimity is not a concern when a case involves sexual abuse perpetrated against a minor and the jury believes that a pattern of conduct of sexual abuse occurred.

{¶ 43} In the instant matter, K.K. testified that between the ages of six and eleven, Addison sexually abused her on numerous occasions. Addison argues that, in order to find him guilty, the jury was required to agree unanimously on the specific act that constituted each offense of the indictment. However, like in *Blankenburg*, we find the jury was only required to believe or disbelieve a pattern of conduct of sexual abuse occurred. Thus, the trial court was not required to provide instructions compelling the jury to agree on the specific incidents they believed established rape or gross sexual imposition for the years indicated in the indictment. *Bowling* at ¶ 32, citing *State v. Ambrosia*, 67 Ohio App.3d 552, 561 (6th Dist.1990) (finding an instruction compelling the jury to agree as to the date, time, and events in child rape case would have been erroneous, as the jury was only required to find the victim's testimony true to find defendant guilty of raping the victim over a period of years as alleged in the indictment). As such, the specific jury instruction requested by Addison was not necessary.

{¶ 44} We also find it immaterial that the jury decided to convict on some of the charges and to acquit of others. It is well established that "[e]ach count in an indictment charges a distinct offense and is independent of all other counts; a jury's decision as to one count is independent of and unaffected by the jury's finding on another count." *State v. Davis*, 12th Dist. Butler No. CA2010-06-143, 2011-Ohio-2207, ¶ 37, citing *State v. Brown*, 12 Ohio St.3d 147, 149 (1984). Consequently, we find the jury's decision to convict Addison of some of the charges, and to acquit on others, is not evidence of a piecemeal verdict.

{¶ 45} As a result, the trial court did not abuse its discretion in giving a general unanimity jury instruction. Addison's second assignment of error is overruled.

*Addison*, 2020 WL 3494430, *7-8.

Generally, a claim that a trial court gave an improper jury instruction – or failed to

give a requested instruction – is not cognizable on habeas review, unless the petitioner

28

establishes the erroneous instruction so infected the entire trial that the resulting

conviction violates due process of law.  *Estelle v. McGuire*, 502 U.S. 62, 75 (1991).

Petitioner fails to meet this difficult standard, because nothing in the state court record

suggests the jury instructions resulted in a trial so unfair that it denied Petitioner due

process.  The record reflects the trial court instructed the jury that each count in the

Indictment represented a separate and distinct matter, and that each count and the

evidence applicable to each count must be considered separately.  (Trial Tr., Doc. 6-29,

at PAGEID # 2239.)  The trial court also instructed the jury that its decision on one

count must not influence its decision on the others.  (*Id.*)  The consideration given to

each count is evident by the fact that Petitioner was convicted of some counts (counts

one through five in Case No. 2017CR0823 and counts one and three in Case No.

2018CR0721), and acquitted of others (counts six and seven in 2017CR0823 and

counts four and five in 2018CR0721).  The trial court confirmed that the verdict form

was signed by all jurors.  Upon defense request, the jurors were polled in open court

and acknowledged they were unanimous in their verdicts.  (Doc. 6-30, at PAGEID #

2326-2327.)

On direct appeal, the appellate court carefully considered Petitioner's claim,

finding the minor victim testified Petitioner sexually abused her consistently between six

and eleven years of age, and that under those circumstances, the trial court's general

unanimity instruction was sufficient.  The court concluded the jury was not required to

agree on the specific incidents establishing each charge, so long as the jury agreed that

a pattern of sexual abuse occurred.  This interpretation of state law is binding on this

court.  *Davidson v. Lindamood*, No. 18-5593, 2018 WL 6431035, *3 (6th Cir. Dec. 3,

2018) ("[A] state court's interpretation of state law is binding on a federal habeas court.") (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)).

Additionally, although the Supreme Court has determined that the United States Constitution requires jury verdicts in criminal cases to be unanimous and not by majority vote, *Ramos v. Louisiana*, 140 S. Ct. 1390, 1407 (2020), the Supreme Court has never required unanimity on the facts supporting a verdict.  See *Schad v. Arizona*, 501 U.S. 624, 631 (1991) ("We have never suggested that in returning general verdicts . . . the jurors should be required to agree upon a single means of commission . . . ."). Therefore, Petitioner cannot demonstrate that the decision of the appellate court was contrary to clearly established Supreme Court precedent, or involved an unreasonable determination of the facts.  Petitioner's second claim for relief lacks merit and should be **DENIED**.

### 3.  Improper Joinder

In his third claim for relief, Petitioner argues the trial court improperly permitted the joinder and consolidation of the State's cases involving K.K. with the case involving M.A, and this joinder allowed one case to bolster the other.

On direct appeal, the Twelfth District Court of appeals considered and rejected this claim on the merits, finding:

{¶ 46} Assignment of Error No. 3:

{¶ 47} THE COURT ERRED BY CONSOLIDATING CASES 2017 CR 00823 AND 2018 CR 00721.

{¶ 48} Next, Addison challenges the trial court's decision to consolidate cases 2017-CR-00823 and 2018-CR-00721. Addison contends the joinder was in error because the offenses were not of the same or similar character, and even if they were, such a fact is not an appropriate basis for joinder because joinder highly prejudiced Addison.

{¶ 49} It is well settled that "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting State v. Torres, 66 Ohio St.2d 340 (1981). "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). Nonetheless, pursuant to Crim.R. 14, if it appears that the defendant would be prejudiced by joinder of the charged offenses, the trial court may grant a severance. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 95.

{¶ 50} While the defendant bears the burden of proving prejudicial joinder, the state may rebut a defendant's claim of prejudice by utilizing one of two methods. *State v. Moshos*, 12th Dist. Clinton No. CA2009-06-008, 2010-Ohio-735, ¶ 79. Initially, pursuant to the "other acts test," the state may rebut the defendant's claim of prejudice by demonstrating it could have introduced evidence of the joined offenses at separate trials pursuant to the "other acts" provision found in Evid.R. 404(B). *State v. Coley*, 93 Ohio St.3d 253, 259, 2001-Ohio-1340; *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 30. On the other hand, the state may separately negate a claim of prejudice by satisfying the less stringent "joinder test," which requires the state to merely demonstrate "that evidence of each crime joined at trial is simple and direct." Moshos at ¶ 79, quoting *Coley* at 260. Simply stated, "[t]he joinder test only requires that the evidence of each joined offense is simple and distinct and ensures that a jury would be capable of segregating the proof required for each offense." *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, ¶ 180 (7th Dist.).

{¶ 51} On appeal, Addison focuses much of his argument on claims that the joinder fails the "other acts" test set forth above. However, "[i]f the state can meet the joinder test, it need not meet the stricter 'other acts' test." *Moshos* at ¶ 79, quoting *State v. Johnson*, 88 Ohio St.3d 95, 109, 2000-Ohio-276. That is, "[a] showing by the state that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper." *State v. Bice*, 12th Dist. Clermont No. CA2008-10-098, 2009-Ohio-4672, ¶ 53. Thus, "an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)." *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

{¶ 52} As an initial note, we disagree with Addison's argument that M.A.'s claims were not credible enough to charge on their own and that the state only indicted Addison for the "purpose of the prejudicial nature." Rather, the record reflects that it is not unusual to have cases open and pending while additional information comes forward. Additionally, the investigator of M.A.'s

case testified that new information had come forward that would have bolstered the investigation in 2016; however, it was ultimately up to the prosecutor whether or not to bring charges against Addison sooner than 2018. Despite the delay in indicting Addison for his alleged inappropriate contact with M.A., we find the allegations were sufficient to charge on their own.

{¶ 53} Furthermore, after a thorough review of the record, we find no error in the trial court's decision to consolidate cases 2017-CR-00823 and 2018-CR-00721. In this case, the state presented an organized overview of the facts and charges alleged against Addison by his three daughters. The witnesses were all "victim specific" in their testimony, including testimony from each of the alleged victims detailing her own alleged sexual encounters with Addison, as well as testimony from the detectives regarding their investigation into each girl's allegations. The state also kept each victim's allegations and the supporting evidence separate in its opening and closing statements, and avoided blurring one instance of abuse into another throughout the trial. Thus, despite Addison's claims to the contrary, we find the evidence pertaining to each victim and each offense could easily be segregated. This is further evidenced by the jury's ability to sort through the evidence in order to find Addison not guilty of four counts of rape. Consequently, we find the record presents clear and direct evidence as to each separate victim such that the jury was readily able to segregate the proof on each charge. Therefore, due to the separate and distinct nature of the evidence of each crime, we find Addison was not prejudiced by the joinder of the charged offenses.

*Addison*, 2020 WL 3494430, *8-9.

The AEDPA requires this Court to first determine whether Petitioner has alleged a violation of a federal constitutional right, and if so, whether a state court has adjudicated the claim on the merits. When both requirements are met, AEDPA deference is due. Although improper joiner, in itself, does not violate the Constitution, *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986), misjoinder would rise to the level of a constitutional violation if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial. Here, on direct appeal, the appellate court discussed Petitioner's constitutional joinder claim only in terms of state law, specifically Ohio Criminal Rule 8(A), Criminal Rule 14, and Ohio Evidence Rule 404(b). However,

"when a state court rejects a federal claim without expressly addressing it, it is rebuttably presumed that the claim was adjudicated on the merits," and that AEDPA deference applies.  *Lamar v. Houk*, 798 F.3d 405, 427 (2015), *citing Johnson v. Williams*, 568 U.S. 289, 293 (2013); *Collins v. Green*, 838 F. App'x 161, 167 (6th Cir. 2020) (finding Kentucky state court's joinder-prejudice analysis entitled to AEDPA deference even though the state court's analysis "was not conducted deliberately as a federal constitutional claim").  In this case, the court of appeals carefully considered the joinder issues in a manner consistent with the federal due process prejudice inquiry. Petitioner has not argued otherwise, and the Court finds the decision of the state appellate court deserving of AEDPA deference.

On habeas review, the burden of proving that the misjoinder of offenses rose to the level of a due process violation falls squarely on Petitioner.  *LaMar v. Houk*, 798 F.3d 405, 427 (2015).  To be sure, a risk of undue prejudice exists whenever the joinder of counts permits the introduction of evidence of other crimes.  This is because "the possibility exists that a jury may use the evidence of one of the charged crimes to infer a general criminal disposition by the defendant."  *Collins v. Green*, 838 F. App'x 161, 171 (6th Cir. 2020).  However, the prejudice a petitioner must demonstrate in order to justify a grant of habeas relief "is actual prejudice, not merely the potential for prejudice." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007).  Here, Petitioner argues his two pending cases were improperly joined in order to bolster the allegations against him. Petitioner's argument is speculative at best, and not supported by the record.  The Court of Appeals rejected Petitioner's claim, finding the evidence as to each count (and each victim) was separate and distinct and easily separated.  The record reveals that

Petitioner was acquitted of charges involving each victim, establishing the jury had the ability to separate the evidence of the distinct incidents – and, in fact, did so. Moreover, the trial court instructed the jurors that each count represented a separate and distinct matter and the jury must consider each count and the evidence related to each count separately. (Doc. 6-29, at PAGEID # 2229.) The court also informed the jury that its verdict as to one count may not influence its verdict on any other count. *Id*. A jury is presumed to follow the instructions of the court. *See Samia v. United States*, 599 U.S. --- (2023), 2023 WL 4139001, *6 (June 23, 2023) (noting "our legal system presumes that jurors will 'attend closely the particular language of such instructions in a criminal case and strive to understand, make sense of, and follow'" jury instructions) (quoting *United States v. Olano*, 507 U.S. 725, 740 (1993)). *See United States v. Chavis*, 296 F.3d 450 at 461-62 (6th Cir. 2002) ("[T]he danger of prejudice resulting from improper propensity inferences can be reduced significantly," when the court issues "proper curative instructions" for the jury to "consider separately . . . the evidence that relates to each charge.") (citing *Lane*, 474 U.S. at 450 n.13). Consequently, the trial court's instruction in this case limited any potential prejudice.

Without asserting more than theoretical possibilities, Petitioner has not demonstrated that the decision of the court of appeals was contrary to or involved an unreasonable application of clearly established federal law, or involved an unreasonable determination of the facts. Petitioner's third claim for relief lacks merit and the Undersigned **RECOMMENDS** that it be **DENIED**.

### 4. Sufficiency of the Evidence and Manifest Weight

In his fourth claim for relief, Petitioner argues the evidence was insufficient to

support his convictions, and in his fifth claim for relief, he argues his convictions were against the manifest weight of the evidence.  On direct appeal, the Twelfth District Court of Appeals consolidated the discussion involving the sufficiency of the evidence and manifest weight.  The court rejected both claims, opining as follows:

{¶ 54} Assignment of Error No. 4:

{¶ 55} THE EVIDENCE WAS INSUFFICIENT FOR A FINDING OF GUILTY.

{¶ 56} Assignment of Error No. 5:

{¶ 57} THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 58} In his remaining assignments of error, Addison argues that his convictions are against the manifest weight and are not supported by sufficient evidence.

{¶ 59} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 60} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, this court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 61} Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency.  *Stringer*, 2013-Ohio-988 at ¶ 30. Therefore, a determination that a conviction is supported by the weight

of the evidence will also be dispositive of the issue of sufficiency. *Id*. For ease of discussion, we will analyze the convictions as they relate to each child.

K.K.

{¶ 62} In regards to K.K., Addison was convicted of four counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides in relevant part that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 63} As pertinent to this appeal, sexual conduct means "without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A); *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 38 (sexual conduct includes digital penetration).

{¶ 64} Addison was also convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides:
No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
* * *
(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶ 65} The Revised Code defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 66} Addison argues his convictions are against the manifest weight and supported by insufficient evidence because K.K.'s allegations were so "generic" that the state could not allege specific acts that constituted the offenses alleged and because K.K. only disclosed the abuse after M.A.'s disclosure.

{¶ 67} As discussed above, K.K. testified that Addison sexually assaulted her every weekend she visited with Addison. K.K. indicated the abuse began when she was around six or seven years old, in second grade, and occurred every year until she was 11 years old. K.K. described the various forms of assault, and stated Addison would put his fingers in her vagina, touch her breasts, make her masturbate him, insert his penis into her mouth, vagina, and onto her leg, and attempted to insert his penis into her "back

part." K.K.'s testimony describing the sexual conduct was consistent with the statements she gave to the Mayerson Center, the social worker from Children's Hospital, and in making her disclosure to Marshall and Caldwell. Moreover, while "[t]here is nothing in the law that requires that a sexual assault victim's testimony be corroborated as a condition precedent to conviction[,]" we find K.K.'s allegations were further corroborated by additional evidence presented at trial. *State v. West*, 10th Dist. Franklin No. 06AP-111, 2006-Ohio-6259, ¶ 16. Specifically, the DNA mixture found on Addison's sheet contained Addison's semen and K.K.'s DNA, which the DNA analyst testified was consistent with K.K.'s allegation that Addison forced her to masturbate him to completion. Furthermore, when confronted with K.K.'s allegations during the controlled call, Addison did not deny the allegations. Rather, Addison indicated K.K. did not have to come over anymore and that "their little secret" was done.

{¶ 68} While Addison argues K.K.'s allegations were too vague to be credible, "[a] jury is in the best position to take into account the witnesses' demeanor and thus to assess their credibility, and therefore is entitled to believe or disbelieve all, part, or none of the testimony of a witness." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 90. K.K.'s testimony, if believed, is sufficient to prove that Addison engaged in sexual conduct with K.K. when she was under the age of thirteen at least four times. K.K.'s testimony also sufficiently established that Addison engaged in sexual contact with K.K. by touching an erogenous zone of K.K.'s, her breasts specifically, and by forcing K.K. to touch his penis. The jury could have reasonably concluded that Addison acted as he did for the purpose of sexual gratification.

{¶ 69} We also reject Addison's argument that K.K.'s disclosure is somehow less believable because it was prompted by M.A. or Caldwell. Rather, the record reflects K.K. disclosed the abuse in response to Addison's threat to engage in vaginal intercourse the next time she visited. Additionally, due to the reaction to M.A.'s disclosure, K.K. was discouraged from disclosing her abuse sooner, as she was unsure if anyone would believe her. Thus, we find a reasonable jury could have concluded that K.K.'s disclosure was genuine.

{¶ 70} Accordingly, when viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Addison committed the crimes of gross sexual imposition and rape. We similarly conclude the jury, in resolving the conflicts in the evidence, did not create a manifest miscarriage of justice so as to require a new trial and that Addison's convictions are not against the manifest weight of the evidence.

M.A.

{¶ 71} With regard to M.A., Addison was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(1) and (4), which state:
No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
(1) The offender purposely compels the other person * * * to submit by force or threat of force.
* * *
(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person."
The Revised Code defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh [and] pubic region, * * * for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 72} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Additionally, a victim "need not prove physical resistance to the offender." R.C. 2907.05(D). This court has specifically recognized that the "force" requirement "need not be overt and physically brutal, but can be subtle and psychological." *State v. Rankin*, 12th Dist. Clinton No. CA2004-06-015, 2005-Ohio-6165, ¶ 47.

{¶ 73} Addison argues his convictions related to M.A. are against the manifest weight of the evidence and are not supported by sufficient evidence because M.A. only reported the abuse out of anger with Addison. Addison further claims the allegations by M.A. were insufficient to prosecute until they were inappropriately bolstered by the claims in Case No. 2017-CR-00823.

{¶ 74} At trial, M.A. testified to two specific instances of sexual assault. First, M.A. indicated that in 2007 Addison touched the outside of her vagina area with his hands. M.A. also described a time when she and Addison were sleeping on the floor at Addison's residence and she awoke to find Addison touching her leg and "trying to go * * * between [her] legs and up [her] thighs." At that point, M.A. got up, went to the bathroom, and laid down on the opposite side of Addison's residence. M.A. also described receiving inappropriate messages from her father asking M.A. to "sit on [his] face" and further noted that Addison frequently made suggestive comments regarding her body. M.A. also indicated Addison would watch her take showers when she was at his residence.

{¶ 75} M.A. described Addison as angry and mean, and indicated he smashed her phone with a hammer the night she disclosed the abuse. M.A. testified that was not the only occasion Addison had smashed a device of hers and that she had witnessed him angrier on other occasions. M.A. indicated Addison exhibited an overall angry and hostile attitude, and that she feared the consequences of disclosing the abuse sooner. Specifically, the testimony at trial revealed that M.A. was fearful of retribution if she disclosed the abuse, as Addison had indicated he would move her away from her family, siblings, and friends if she told anyone what happened. This led to M.A.'s fear that if she told, she would "get taken away" and that she would be separated from K.K. According to M.A., she "kn[e]w how he [wa]s and [she] didn't want [K.K.] to get hurt."

{¶ 76} After reviewing the entire record, we do not find that the jury clearly lost its way and created a miscarriage of justice. The testimony of M.A., if believed, weighed in favor of Addison's guilt. Although brief, M.A.'s testimony was sufficient to show that illegal sexual contact occurred. R.C. 2907.01(B) (defining "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh [and] pubic region" for the purpose of sexual gratification). While Addison denies the offenses took place, and claims that M.A. had ulterior motives for disclosing the alleged abuse, the jury was in the best position to assess M.A.'s credibility, and therefore was entitled to believe M.A. With regard to the force element in R.C. 2907.05(A)(1), we find there is evidence in the record indicating that Addison compelled M.A. to submit to the sexual contact by force or threat of force. The record reflects that Addison, as M.A.'s father, held a position of authority over M.A. at the time of the abuse. This fact, coupled with Addison's threats to "take M.A. away" if she told, and M.A.'s desire to protect K.K. from experiencing similar injury, establishes that Addison used subtle and psychological degrees of force to facilitate the inappropriate contact. Furthermore, Addison initiated the contact with M.A. while she was sleeping. When she awoke, Addison was physically attempting to get between her legs and proceed up her up her thighs. As a result, we find a reasonable jury could conclude Addison compelled M.A. to submit to the sexual contact by force or threat of force.

{¶ 77} Based on the above, we find that Addison's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented evidence which, if believed by the jury, would allow it to conclude that all of the elements of each gross sexual imposition conviction were proven beyond a reasonable doubt.

*State v. Addison*, Nos. CA2019-07-058, CA2019-07-059, 2020-Ohio-3500, 2020 WL 3494430, *9-12 (Oh App. 12th Dist. June 29, 2020).

Because a claim that his convictions are against the manifest weight of the evidence does not state a claim under the federal Constitution, *Johnson v. Havener*, 534 F.2d 1232, 1234 (6th Cir. 1986), the Court will confine its analysis to the sufficiency of the evidence.  *See also Taylor v. Buchanan*, No. 20-3120, 2020 WL 7586967, at *3 (6th Cir. June 30, 2020) ("To the extent Taylor separately contended his convictions are against the manifest weight of the evidence, that is a state law claim unavailable for federal habeas review independent from the constitutional sufficiency of the evidence claim just considered.")

An allegation that a verdict was entered based upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *Jackson v. Virginia*, 443 U.S. 307 (1979).  In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  That is:

> [T]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . .  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson*, 443 U.S. at 319.

Because Petitioner's case is governed by the AEDPA, two levels of deference are required:

> In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

A federal court may not overturn a state court decision that rejects a sufficiency of the evidence claim merely because the federal court disagrees with the state court's resolution of that claim.  Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith*, 565 U.S. 1, 2 (2011).  Indeed, for a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality."  *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).  A state court's determination that the evidence does not fall below that threshold is entitled to "considerable deference under the AEDPA."  *Id*.

Petitioner was convicted of multiple counts including several counts of rape of a child under 10 years of age and under 13 years of age.  Petitioner does not contend that the victims' testimony, if believed, would not establish the crucial elements of the charges to which he was convicted.  Instead, Petitioner argues that his conviction should be reversed because the victims were not credible witnesses due to their age, inconsistent stories and recollection of events, vagueness of the allegations, retaliatory

motive, and lack of corroboration and physical evidence.  (Doc. 9, at PAGEID # 2480-2481.)  At base, Petitioner's insufficiency of the evidence claim rests on a challenge to victim credibility.   But, "attacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence."  *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002).  Assessing the credibility of witnesses is simply beyond the scope of habeas review of sufficiency of the evidence claims.  *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000).  *See also Jerome v. Macauley*, No. 22-2136, 2023 WL 4058595, *2 (6th Cir. May 22, 2023) (reiterating that a reviewing court, sitting in federal habeas corpus, may not "re-evaluate the credibility of witnesses") (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)).

In sum, the state appellate court made detailed findings in its decision rejecting Petitioner's claim.  These factual findings included recounting the testimony of the victims as to the specific sexual conduct involved over the course of many years and the position of authority Petitioner had over both young victims.  The victims' testimony established all the elements of the offense, and Petitioner's challenges of insufficiency "raise questions of credibility – a matter for the jury and not for a reviewing court." *Jerome*, 2023 WL 4058595 at *2.  Petitioner has not demonstrated that the decision of the state court involved an unreasonable determination of the facts or involved an unreasonable application of *Jackson*.  Petitioner's fourth and fifth claims for relief lack merit, and the Undersigned **RECOMMENDS** these claims be **DENIED**.

### 5.  Ineffective Assistance of Appellate Counsel

In his sixth claim for relief, Petitioner argues his appellate counsel were

ineffective for failing to raise various instances of trial court error on direct appeal. The Undersigned considered Petitioner's various allegations in connection with the procedural default analysis undertaken in connection with Petitioner's seventh through tenth and twelfth claims for relief. For the same reasons expressed there – namely that Petitioner offers only conclusory arguments and speculation and has presented no evidence of deficiency or prejudice to support his claims, the Undersigned **RECOMMENDS** Petitioner's sixth claim for relief be **DENIED** as wholly without merit.

## VI. CONCLUSION

For the foregoing reasons, this Court concludes that Petitioner is not entitled to federal habeas corpus relief based on the grounds asserted in his petition.

### IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the petition because Petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S. 473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).[1]

3. With respect to any application by Petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of

---

[1]*See Winburn v. Nagy*, 956 F.3d 909, 912 (6th Cir. 2020) ("Congress knew how to exempt § 2241 petitions from the certificate of appealability requirement when it wished, indicating that Congress chose to require certificates of appealability for state but not federal prisoners who invoke § 2241.").

any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** Petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

<u>*s/Stephanie K. Bowman*</u>
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

JOSEPH S. ADDISON,                      Case No. 1:21-cv-553
        Petitioner,

                                      Dlott, J.
      vs.                           Bowman, M.J.

WARDEN, CHILLICOTHE CORRECTIONAL
INSTITUTION,
        Respondent.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).